**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KATREESHA GORDON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 5226** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ILLINOIS-CHICAGO,** | ) | |
| **named as UNIVERSITY OF ILLINOIS-** | ) | |
| **CHICAGO,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

On June 13, 2017, Plaintiff Katreesha Gordon, who worked at the University of Illinois-Chicago Hospital ("UIC Hospital") as a nurse technician, filed a charge of discrimination with the Illinois Department of Human Rights, asserting that Defendant UIC Hospital had discriminated against her based on her pregnancy. In the months and years that followed, Plaintiff alleges that Defendant retaliated against her for filing that charge by harassing her, suspending her, and ultimately causing her to resign. On August 2, 2019, Plaintiff filed this lawsuit [1], and on March 7, 2020, Plaintiff filed her third and final amended complaint [34]. As stated in that complaint, Plaintiff brings her action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, alleging that Defendant unlawfully retaliated against her for engaging in activity protected by the statute. Defendant now moves for summary judgment [65]. As explained here, the motion is granted.

---

[1]      Defendant states that it is incorrectly named in Plaintiff's complaint, and that Defendant's correct name is "Board of Trustees of the University of Illinois." (Def.'s L.R. 56.1 Statement of Material Facts in Supp. of Its Mot. for Summ. J. (hereafter "Def.'s SOF") [66] at 1.)

## BACKGROUND

Plaintiff Katreesha Gordon began working for Defendant UIC Hospital in April 2014 as a nurse technician. (Def.'s SOF ¶ 4.) Gordon's job involved assisting Hospital patients in several ways, including by checking their blood pressure, making their beds, assisting them with meals, and washing and dressing them. (*Id.*) On October 12, 2014, the Hospital transferred Gordon to "7 East," a nursing unit on the seventh floor, where Gordon's supervisor was Pamela Crawford. (*Id.* ¶ 5.)

In mid-December 2016, Gordon learned that she was pregnant. (*Id.* ¶ 6.) Soon after, Gordon claims, Crawford began to harass her because of the pregnancy. (Gordon Dep., Ex. A to Def.'s SOF (hereafter, "Gordon Dep.") [66-1] at 38:21-24.)[2] Specifically, Gordon asserts that when she asked for reasonable accommodations, Crawford told her "this is your job whether you're pregnant or not . . . if you don't like it, you can get another job." (*Id.* at 39:9-11.) Gordon also says that Crawford criticized her daily for taking breaks, for using the restroom, and for moving too slowly. (*Id.* at 39:12-16.) When the pregnancy complications resulted in some bleeding, Gordan says she asked Crawford for job duties that did not involve heavy lifting, but Crawford refused. (*Id.* at 39:20-40:8.)

Following these events, on June 13, 2017, Gordon filed a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR") alleging harassment based on her pregnancy. (Def.'s SOF ¶ 6.) After filing the Charge, Gordon alleges she faced retaliation in the form of harassment. (*Id.* ¶ 8.) As detailed below, Gordon identifies 11 total incidents of harassment that occurred in the months and years subsequent to filing the Charge. (*Id.* ¶¶ 9-56; Gordon Dep. at 42:16-98:20.)

---

[2]    All citations herein refer to the page number of the file in the docket, not the page number that a party has typed on a document. Hence, this citation is to page 38, though it is page 77 of the deposition.

A.    **Post-Charge Incidents**

1.    **First alleged incident**

On November 8, 2017, Gordon was in the bathroom at work when she overheard two co-workers complain that there were too many nurse technicians in Gordon's unit. (Def.'s SOF ¶ 9.) Gordon had recently returned to the unit following her maternity leave, and because of her return, her unit had more nurse technicians during the day shift than was necessary. (Gordon Dep. at 18:9-19:5.) When units have extra nurse technicians on hand, workers in the over-staffed unit "float" to other units to help out on a temporary basis. (*Id.*) According to Gordon, "nobody want[ed] to be floated. They want to stay on their unit." (*Id.* at 19:3-4.) Presumably due to that concern about floating, Gordon says she heard one of the two co-workers in the bathroom that day say that she was "definitely going to have to talk to Pam [Crawford]" to have Gordon "pushed off of the floor" and into a different unit. (Gordon Dep. at 21:12-13.)

On November 12, 2017, Gordon sent an email to Danielle Earls, one of the Hospital's employees who worked in the Office of Access and Equity. (*Id.* at 17:8-20, 44:9-18.) As the court also notes below, Gordon sent emails like this one following every alleged incident, documenting the conduct that she felt was hurtful. Importantly, in neither this nor any other email does Gordon mention her 2017 charge, let alone suggest that the alleged incident was in retaliation for filing that charge. (Gordon Emails, Ex. A to Def.'s SOF (hereafter "Gordon Emails") [66-1] at 156.) Rather, in her email to Earls, Gordon says the nurses "do not like" her because they "cli[que] up with [her] boss Pamela Crawford." (*Id.*)

2.    **Second alleged incident**

On November 17, 2017, Gordon was tasked with making a patient's bed, a required duty of her job. (Gordon Dep. at 45:22-46:13.) The patient asked Gordon to wait and make the bed later. (*Id.* at 46:13-18.) Gordon acquiesced and told the patient that instead of making the bed, she would tell the technician who worked the next shift, Cassandra Naylor, to do it. (*Id.*) After Gordon told Naylor that she would need to make the patient's bed, Gordon alleges Naylor "went

3

off." (*Id.* at 46:20.) As Gordon recalls, Naylor began yelling "up and down the hallway" and "went to the patient's room and yelled at the patient and told them she wasn't making their bed." (*Id.* at 46:18-24).

The following day, Crawford issued a verbal warning to Gordon for failing to make the bed. (*Id.* at 47:1-21.) Gordon tried to explain the situation, but Crawford responded by stating that Gordon had "failed" to do her job, and that the patient had reported that it was Gordon who "didn't make her bed." (*Id.* at 47:3-8.) Gordon asked Crawford to talk to a nurse who had observed the incident, but Crawford declined, and stated that "it wasn't needed." (*Id.* at 47:12-21.) According to Gordon, another technician later said that Naylor had "scared the patient so bad, that she ended up flipping the story and putting it on [Gordon]." (*Id.* at 47:9-12.) Gordon documented this incident in an email to Earls at the Office of Access and Equity, again bringing up the "clique" issue while failing to either mention the 2017 charge or suggest that this was an incident of retaliation. (Gordon Emails at 155.)

### 3. Third alleged incident

On December 13, 2017, an agency technician—that is, a temporary employee brought in from a staffing agency—was working during Gordon's shift. (Gordon Dep. at 52:14-53:11.) Gordon believed it was her turn to "sit," a desirable task that involves monitoring patients while sitting down, instead of having to "work the floor" on her feet. (*Id.* at 52:23, 53:20-54:2.) Typically, staffing agency employees are not supposed to be assigned to "sit," because they do not have full access to the Hospital's charting system. (*Id.* at 56:1-3.) Despite this policy, Crawford allowed the agency technician to "sit," and made Gordon work the floor. (*Id.* at 55:11-15.) Crawford allegedly made the decision based on the fact that Gordon had been able to "sit" during her prior shift, though Gordon believes "it does not matter if [she] sat the day before." (Gordon Emails at 157.) Rather, Gordon believes this was "a typical day of one of [Crawford's] forms of harassment for [Gordon]," because Crawford "didn't like" her. (Gordon Dep. at 55:18-19, 21.) Later that day, Gordon sent an email to Crawford detailing the incident and expressing her grievance. (Gordon

4

Emails at 157.)  In that email, Gordon did not mention the 2017 charge or refer to the incident as an example of retaliation; instead, she said it was due to a "lack of leadership skill and [a] bad judgment call."  (*Id.*)

### 4.    Fourth alleged incident

On March 29, 2018, Gordon was in an EKG certification class at the Hospital when Crawford pulled her out and assigned her to work the floor.  (Gordon Dep. at 57:16-24.)  Gordon believes another technician, Trinette, was available to fill in and work the floor while Gordon finished her certification.  (*Id.* at 58:1-11.)  From Gordon's perspective, this was an instance of Crawford showing "clear as day favoritism" for Trinette over Gordon.  (*Id.* at 60:11.)  Gordon documented this incident in an email to Tiesa Hughes-Dillard, the Director of Nursing.  (Def.'s SOF ¶ 21.)  Gordon told Hughes-Dillard that "the favoritism need[s] to be address[ed]," but never mentioned the 2017 charge or alleged retaliation.  (Gordon Emails at 158.)

### 5.    Fifth alleged incident

In early April 2018, a patient's family member told Gordon that Cassandra Naylor, another nurse technician, had been talking "very nasty" about Gordon behind her back.  (Def.'s SOF ¶ 23.)  According to the family member, Naylor said that "nobody on this floor likes [Gordon] . . . the managers don't like [Gordon]."  (Gordon Dep. at 62:18-19.)  Moreover, Naylor allegedly told the family member that management "want[ed] [Gordon] off this floor" because of "a whole lot of stuff," including that Gordon was "lazy" and she "wasn't a good worker."  (*Id.* at 63:10, 63:12-13.)  On April 5, 2018, Gordon relayed this incident to Crawford.  (Def.'s SOF ¶ 25.)  When Gordon saw "that nothing was getting done" by Crawford or Hughes-Dillard concerning the harassment she was experiencing, she "started going over their head[s]."  (Gordon Dep. at 65:2-3.)  On June 1, 2018, Gordon sent an email to Hughes-Dillard's boss, Shelly Major, complaining of the "unfair treatment and bullying and harassment" taking place in her unit.  (Def.'s SOF ¶ 26.)  This was also the first email in which Gordon alleges the treatment she experienced was "a fo[r]m of retaliation."  (Gordon Emails at 160.)  But Gordon's email does not mention the 2017 charge and

does not otherwise explain what she means.  As discussed below, Gordon later asserted that the "retaliation" had to do with the social dynamics within her unit, and not with her 2017 charge.

### 6.    Sixth alleged incident

At some point in 2017, not specified in the record, Gordon told Hughes-Dillard that she was having difficulty with her shift schedule because of "daycare issues" with her children who were in "an unsafe environment."  (Def.'s SOF ¶ 28; Gordon Dep. at 22:17-23:2.)  On November 17, 2017, Hughes-Dillard created and offered Gordon a shift assignment that began at 11:00 a.m. and ended at 7:00 p.m, which Hughes-Dillard thought would be an improvement for Gordon over her then-current 7:00 a.m. to 3:00 p.m. shift.  (Def.'s SOF ¶¶ 29-30.)  But Gordon preferred to work the 7:00 a.m. shift and turned down Hughes-Dillard's offer.  (Id. ¶ 31.)  On July 1, 2018, the Hospital transferred Gordon to a 3:00 p.m. to 11:00 p.m. shift; Gordon was selected for the shift change because she had the least seniority among nurse technicians in her unit.  (Id. ¶¶ 33, 35.)  Gordon preferred Hughes-Dillard's earlier offer of a shift starting at 11:00 a.m. over the transfer to the 3:00 p.m. shift, but that 11:00 a.m. shift had already been given to another technician, Cassandra Naylor.  (Id. ¶ 32.)  Gordon wrote to Earls at the Office of Access and Equity, explaining that while she understood the unit has "operational need[s]" and "sometimes there will be changes and you may have to switch to another shift[ ] especially when you are the one with least seniority," the Hospital was "not taking into consideration" her life circumstances.  (Gordon Emails at 161.)  On July 22, 2018 Gordon emailed Earls again, alleging that "everything that [is] being done to me is a [form] of retaliation."  (Id. at 162.)

In addition to noting the shift change in her July 22 email, Gordon complained of "favoritism, cli[ques], bullying, and long working relationship[s]" between her "manager and the nurses" she worked with.  (Id.)  Gordon was "not part of their clique," and as a result, she believed "eventually, they'll try and force [her] out." (Gordon Dep. at 29:22-24.)  Gordon believed she was excluded from the "clique" because, among other things, Gordon associated with another

technician, Brac Newman, whom the clique disliked. (*Id.* at 30:1-31:7.) As Gordon explains, Newman

> was another technician that they didn't like, that [the clique had] been trying to force out and bully as well. And when I first started there, I started talking to her. They told me not to talk to her. Don't affiliate myself with her, but this was somebody that was alongside of me working as a technician. All I wanted to do was just come to work and just take care of my family.

(*Id.* at 30:4-11.) Gordon felt she had to "have some type of working relationship" with Newman "in order to get [the] job done." (*Id.* at 32:3-5.) So Gordon decided she was "staying neutral." (*Id.* at 32:14.) This fateful choice, Gordon believes, led to the "retaliation." (*Id.* at 32:21-33:4.)

### 7. Seventh alleged incident

As the assigned 11:00 a.m. shift did not work for her schedule, on July 22, 2018, Gordon applied for a position with 5 East, a different unit on another floor of the Hospital. (Def.'s SOF ¶ 40.) Her application was approved on August 26, 2018, and the transfer enabled Gordon to again start her shift at 7:00 a.m. (*Id.*; Gordon Dep. at 36:6-13.) At 5 East, Gordon worked with a new set of co-workers and a new supervisor, Kiana Player. (Def.'s SOF ¶ 41.) Several Filipino-American nurses worked in 5 East, and during Gordon's orientation, on September 19, 2018, Gordon observed two Filipino-American nurses speaking in a language she did not understand. (*Id.* ¶ 42.) Later, one of the nurses told Gordon the conversation had been about her. (Gordon Dep. at 70:16-18.) Gordon took offense, since she believes employees are not "supposed to speak your native language when you're in a work environment . . . when you're speaking in your native language, it's something obviously that you don't want [other people] to hear." (*Id.* at 72:13-17.) Gordon complained about this incident in an email to Hughes-Dillard, but later that day sent another email to Hughes-Dillard explaining that she had handled the issue herself, as she had communicated her "concern" to the offending nurse and had decided she was "going to allow [that nurse] to address these issue[s]." (Gordon Emails at 163-64.)

### 8. Eighth alleged incident

Gordon contends that she experienced ongoing harassment at 5 East. A nurse, Aurora Bella, allegedly "belittled" Gordon by using "hand gestures when she asked [Gordon] to do something, as if [Gordon] was a dog." (Gordon Dep. at 76:19-22.) Gordon, who is Black, understood this treatment to be a product of Bella's "really well known reputation. She doesn't like Black people." (*Id.* at 78:6-9.) In fact, Gordon felt maligned by many of the Filipino-American nurses at 5 East, who Gordon believes "don't like Blacks." Gordon felt that because of her race, she was "at the bottom of the food chain." (*Id.* at 97:22-98:7.)

Gordon also felt bullied by her new supervisor, Kiana Player, after Player wrote her up for being tardy without first giving a warning. (Gordon Emails at 166.) In a March 29, 2019 email to Hughes-Dillard, Gordon complained about these incidents involving Bella and Player, and despaired that despite her transfer to 5 East, she was "again in the same spot going [through] the same thing." (*Id.*) Gordon speculated she "was set up for failure since [Player] was train[ed] and orientated by [Crawford]." (*Id.*)

### 9. Ninth alleged incident

In April 2019, Gordon again felt belittled and harassed by Bella. (*Id.* at 169.) Gordon complained about the situation to Player, but "nothing was done about it." (*Id.*) Gordon sent another email to the Office of Access and Equity, stating she felt "under attack from the manager and staff." (*Id.*)

### 10. Tenth alleged incident

Soon after Gordon was transferred to 5 East, Crawford also transferred to 5 East and shared nurse manager duties with Player. (Def.'s SOF ¶ 52.) On April 1, 2019, Crawford told Gordon that she needed to clean up a patient who had a bowel movement, even though the movement had occurred on another technician's shift, and Gordon's shift had not yet started. (Gordon Emails at 168.) Gordon emailed Hughes-Dillard, explaining that this incident was "just one of many act[s] of favoritism that goes on in this unit." (*Id.*)

8

### 11. Eleventh alleged incident

Later that same day, Gordon sent another email to the Office of Access and Equity, stating that she was being harassed by both Player and Crawford and that the harassment was "at a[n] all time high." (*Id.* at 167.) Gordon was convinced that Player and Crawford were conspiring to find a way to get Gordon fired. (Gordon Dep. at 89:4-12.) Gordon acknowledges she didn't actually overhear the supervisors discussing this but contends that their "actions were clear."

## B. Gordon's Suspension and Resignation

On April 22, 2019, Player suspended Gordon for five days without pay for allegedly failing to perform job duties, documenting erroneous data, jeopardizing patient care, and placing the university at risk for liability. (Gordon Disciplinary Suspension Notice, Ex. A to Def.'s SOF (hereafter Gordon Suspension) [66-1] at 171.) The disciplinary suspension notice identified two specific incidents. First, on March 5, 2019, Bella—the nurse on 5 East who Gordon had complained about on several occasions—reported that Gordon had incorrectly documented the urine output of one of the Hospital's patients. (*Id.*) Bella told Player that she (Bella) had been closely monitoring and recording that patient's output and disagreed with Gordon's documentation. According to the notice, Bella asked Gordon about her documentation, and Gordon said the patient was incontinent and that she had just "estimated the volume." (*Id.*) However, Bella spoke to the patient, who "denied being incontinent of urine only stool." (*Id.*) Bella removed Gordon's documentation.

Second, on March 14, 2019, Bella reported to Player that Gordon had again incorrectly documented a patient's urine output. (*Id.* at 172.) According to Bella, Gordon had documented a much higher volume of urine than the patient's actual void, and the erroneous documentation had almost caused the doctor to discharge the patient from the Hospital. The suspension notice explained that "[t]hese are serious safety concerns that potentially jeopardize[ ] patient wellbeing and place[ ] the University at risk for liability." (*Id.*)

Gordon believes the suspension was an act of retaliation. She states:

9

> [E]ven if I did make – made a mistake like that, you've got to remember I'm new and I'm still in orientation on [5 East], but I didn't get the proper orientation that I needed for that type of document on that type of unit. So those mistakes are usually generally done and you can go into the system and you can correct it, but no one has never been suspended over no stuff like that. This is some retaliation, targeted try and get you fired type of thing where they uses anything to get you fired.

(Gordon Dep. at 100:18-101:3.) The record before the court is otherwise thin regarding Gordon's response to the allegations that led to her suspension, though she does assert that Bella was lying when she made her report to Player, and that Player jumped at the opportunity to suspend Gordon. (*Id.* at 102:6-24.)

On August 26, 2019, Gordon submitted a letter of resignation to the Hospital. (Def.'s SOF ¶ 60.) In the letter, Gordon states that she suffered "bullying, humiliation, favoritism[ ], being single[d] out, and disrespected." (Gordon Resignation, Ex. A to Def.'s SOF [66-1] at 173.) Since she felt she ultimately could not return to the Hospital, she asserted that she was "force[d] to resign." (*Id.*) She also states that, having become "mentally unstable" due to her experience, Gordon had taken time off work and sought help at great personal cost, with the result that she "lost everything," including her "house, car, T.V., appliance, refrigerator, stove." (*Id.*)

## C.    Gordon's Subsequent Employment

Gordon began working at Elmhurst Hospital as a nurse technician on November 4, 2019. (Def.'s SOF ¶ 73.) In January 2020, however, she resigned from that position soon for several reasons: First, her fiancé had contracted COVID-19 and become seriously ill, requiring "two open heart surgeries." (Gordon Dep. at 122:8-10.) Gordon also lost her house and "wasn't making a lot of money" at Elmhurst. (*Id.* at 121:17-122:22.) In addition, Gordon's mother was suffering from depression and anxiety. (Def.'s SOF ¶ 73.) Gordon summed up by saying that there "was a lot going on," and she felt she needed to resign. (Gordon Dep. at 122:21-22.)

In June 2020, Gordon began seeking work at staffing agencies, and in July, she submitted an application to work as a mental health worker. Soon after, she was hired by Favorite Staffing, and she began work there on August 28, 2020. (Def.'s SOF ¶ 74.)

D.  **Gordon's Lawsuit**

On August 2, 2019—just before submitting her resignation at UIC Hospital—Gordon filed a complaint alleging, *inter alia*, that the Hospital retaliated against her for engaging in protected activities in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*  (Pl.'s Compl. [1].)  In her third and final amended complaint, filed on March 7, 2020, Gordon claims that Defendant Hospital's officials "retaliated against her by harassing and humiliating her and ultimately causing her to terminate her own employment by creating a hostile work environment after she filed a charge of pregnancy discrimination with the Illinois Department of Human Rights." (Pl.'s Third Am. Compl. [34] at 1.)  In response to interrogatories, Plaintiff states that she seeks damages for lost wages ($88,000.00), loss of her car ($9,500.00), loss of her house ($202,372.00), emotional distress ($45,000.00), and attorney's fees. (Gordon Interrogs., Ex. A to Def. SOF [66-1] at 151.)  Currently before the court is Defendant's fully-briefed motion for summary judgment.  (Def. Mot. for Summ. J. [65]; Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (hereafter "Pl.'s Resp.") [68]; Def.'s Reply in Supp. of Def.'s Mot. for Summ. J. (hereafter "Def.'s Reply") [72].)  For the reasons stated herein, Defendant's motion is granted.

## DISCUSSION

A.  **Evidence and Arguments Considered by the Court**

Before turning to the merits, the court pauses to address Defendant's objections to certain aspects of Plaintiff's responsive filings.  In its Reply, Defendant contends that (1) Plaintiff made "extraneous assertions" and at times neglected to say anything in response to Defendant's Statement of Facts (Def.'s Reply at 2), (2) Plaintiff failed to cite to the record in her Statement of Material Facts (*id.*), (3) Plaintiff's Response memorandum improperly cited directly to underlying evidence instead of to a Statement of Material Facts (*id.* at 3), (4) Plaintiff submitted an affidavit contradicting her sworn deposition testimony (*id.*), and (5) Plaintiff's emails attached to her affidavit are either insufficiently authenticated, inadmissible hearsay, or both.  (*Id.* at 3-4.) Defendant's assertions are largely correct.  But—where permissible and to the extent outlined

11

below—the court will still consider Plaintiff's evidence in the record and her assertions of fact that are supported by record evidence.

Plaintiff, who is represented by counsel, has made a straightforward admission to 58 of the 80 paragraphs in Defendant's Rule 56.1 Statement of Material Facts. (Pl.'s Resp. to Def.'s Rule 56.1 Statement of Material Facts (hereafter "Pl.'s Resp. to Def.'s SOF) ¶¶ 1-7, 9, 12-13, 16-18, 20, 22-24, 27, 31-34, 36-53, 58, 61-69, 71, 73, 75-80.) With respect to the remaining 22 factual statements, Gordon admits the content of those statements but then adds extraneous commentary. (*See, e.g., id.* ¶ 19 ("The Plaintiff admits only to the content of the subject email but she states that the purpose of the email was to only point out the facts of the incident.").) In just one instance, Plaintiff has actually disputed Defendant's statement. (*See* Pl.'s Resp. to Def.'s SOF ¶ 74 (asserting that Plaintiff began looking for work in June 2020, not July 2020).) With that single exception, Gordon is deemed to have admitted to the entirety of Defendant's Statement of Material Facts. LR 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").

In her own responsive Statement of Material Facts, Plaintiff asserts that "[t]he bullying got worse after [Gordon] filed her charge of discrimination." (Pl.'s Statement of Material Facts in Supp. of Her Resp. to Def.'s Mot. for Summ. J. (hereafter "Pl.'s SOF") [70] ¶ 3.) This "fact," if true, could be of significant importance to Plaintiff's retaliation claim. Local Rule 56.1(b)(3)(C) requires, however, that facts be supported by "references to the affidavits, parts of the record, and other supporting materials." Gordon's Statement of Material Facts does not cite anything for this statement. Thus, while the court still considers facts in the record that pertain to treatment Gordon experienced before and after she filed her charge of discrimination, the court disregards this conclusory statement.

Next, Defendant correctly points out that Plaintiff's Response cites to her own affidavit and numerous email attachments instead of properly citing to a Statement of Material Facts. In order

to streamline the summary judgment process, parties are commonly expected to cite only to the Local Rule 56.1 statements and responses. *Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664-66 (N.D. Ill. 2015) (collecting cases). Though this court has the discretion to strictly enforce Rule 56.1, it is not required to do so, however. *Howard v. Inland SBA Mgmt. Corp.*, 32 F. Supp. 3d 941, 949 (N.D. Ill. 2014) (explaining that district courts may "exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges") (quoting *Modrowski v. Pigatto,* 712 F.3d 1166, 1169 (7th Cir. 2013)). For purposes of this ruling, the court has considered any admissible evidence Plaintiff has cited.

Nor is the court troubled by Defendant's contention that Gordon has offered an affidavit that contradicts her deposition testimony. Defendant is correct that "where deposition testimony and an affidavit conflict, 'the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken . . . .' " *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Circuit 2018) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)). At her deposition, Gordon stated that the harassment at work "began around 2015 going into 2016." (Gordon Dep. at 109:22-23.) In her affidavit, Gordon stated that she discovered she was pregnant in 2016, and subsequently experienced bullying and harassment. (Pl.'s Aff. [71-2] ¶¶ 3-4.) These statements are not in conflict; it is possible that Gordon experienced harassment both before and after her pregnancy.

Finally, Defendant challenges the admissibility of the emails attached to Gordon's affidavit, arguing that they are not properly authenticated and contain hearsay. The court overrules this objection in part. The burden of establishing authenticity is a modest one: it can be met by the "[t]estimony of a witness with knowledge," and by the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item." FED. R. EVID. 901(b)(1), (4). Plaintiff testified in her affidavit that she was "familiar with all of the emails . . . that are attached," and the emails appear on their face to the court to be downloaded from Gordon's email client. (Pl.'s Aff. at 3; *see generally* Pl.'s Additional Emails [71-3] at 2-67.) "Only a prima facie showing of

genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012).

Under the hearsay rule, Plaintiff may not rely on these emails to prove the truth of the statements asserted within them. FED. R. EVID. 801(c). She can, however, rely on the emails to the extent they are used to prove something other than the truth of their content, such as whether a supervisor was on notice of Plaintiff's charge of discrimination. *See Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 468 (7th Cir. 2008) (evidence "used only to show notice" is not hearsay); *see also United States v. Hanjuan Jin*, 833 F. Supp. 2d 957, 969 (N.D. Ill. 2011) (holding that an email had a "proper non-hearsay purpose" where it was used to "establish the state of mind thereby induced . . . such as receiving notice or having knowledge"). Ultimately, because the emails are of little consequence in resolving this claim, their status as hearsay or not is immaterial.

## B.    Plaintiff's Retaliation Claim

To survive a motion for summary judgment, the non-moving party must "identify[ ] specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017)). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While "the burden on the non-movant is not onerous," the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to show a genuine issue of material fact." *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal quotations omitted). Nor can the non-moving party rely on "[i]nferences supported only by speculation or conjecture." *Johnson*, 892 F.3d at 894. A district court must "examine the record in the light most favorable to the non-movant, granting [that party] the benefit of all reasonable inferences that may be drawn from the evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (internal quotations omitted).

Plaintiff's Third Amended Complaint contains two "counts": (1) Retaliation for Engaging in Protected Activities, and (2) Creation of a Hostile and Abusive Working Environment. (Pl.'s Third Am. Compl. ¶¶ 2-3.) At a hearing on Defendant's motion to dismiss, Plaintiff's counsel confirmed, and the parties and court agreed, that Plaintiff's claim in this case is "limited to retaliation." (*See* Tr. of Proceedings [64] at 6:20-21.) That is, the alleged hostile and abusive work environment was allegedly "the function of retaliation," not a separate claim. (*Id.* at 6:18.) In addition, both parties agreed at that hearing that Plaintiff's "pregnancy discrimination claim was either disposed of or not acted on back in 2017." (*Id.* at 6:9-10.) Thus, the court's discussion is confined to Plaintiff's retaliation theory.

Title VII makes it "an unlawful employment practice" for an employer to retaliate against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In addressing the evidence in this case, the parties have framed their arguments using the "indirect" and "direct" methods of proof. But the Seventh Circuit has instructed courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Rather, "the singular question that matters in a discrimination case" is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected activity] . . . caused the . . . adverse employment action." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (internal quotations omitted).

In the context of retaliation, an employee "must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citations omitted). In sum, considering the evidence as a whole, the court asks: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive

caused the [materially adverse action]?" *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (citation omitted). In Gordon's case, the court finds that the record does not.

### 1. Statutorily protected activity

Gordon argues she was retaliated against by the Hospital after she filed a charge of pregnancy discrimination with the IDHR. (Pl.'s Third Am. Compl. ¶ 10-11.) A charge filed with the IDHR is protected activity for purposes of a Title VII retaliation case. *See McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 902-03 (N.D. Ill. 2011) ("The [state and federal fair employment] agencies have a work sharing arrangement providing that a charge filed with one is deemed cross-filed with the other."). It is undisputed that Plaintiff's IDHR is protected activity under the statute.

### 2. Materially adverse action

Defendant concedes that the Hospital's suspension of Gordon on April 22, 2019, was a materially adverse action. (Mem. in Supp. of Def.'s Mot. for Summ. J. (hereafter "Def.'s Mem. in Supp.") [67] at 9.) The court addresses that suspension below, in connection with its discussion of the third element of Plaintiff's case: causation. For now, the court considers whether any other incident, including the numerous allegations of harassment detailed in Defendant's Statement of Facts, can constitute a materially adverse action under the statute. The court holds that they do not.

Material adversity, for purposes of a retaliation claim, requires that a plaintiff show the employer's action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks and citations omitted). "Context matters" in this inquiry, as "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69. But there is a floor below which conduct cannot be said to be *materially* adverse: "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68.

Gordon alleges the incidents of harassment discussed above were materially adverse because they constituted a hostile work environment.

Title VII "forbids employers from requiring people to work in a discriminatorily hostile or abusive environment." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). An employer violates the law where a workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (citation omitted); *see Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009) ("Retaliatory harassment can rise to the level of a hostile work environment if it is severe enough to cause a significant change in the plaintiff's employment status."). In defining "retaliatory hostile work environment," courts in this Circuit have required plaintiffs show, among other things, that the environment was "objectively and subjectively offensive" and the conduct was "severe or pervasive."[3] *Flanagan v. Office of Chief Judge of Circuit Court of Cook Cty., Ill.*, 893 F.3d 372, 375 (7th Cir. 2018). The eleven incidents Gordon raises, documented above, do suggest she routinely felt unwelcome, disrespected, and ostracized by co-workers and supervisors. Her frequent emails to the Office of Access and Equity (among others), documenting her despair over multiple years, clearly show Gordon subjectively found the environment to be pervasively offensive. However, caselaw supports this court's finding that these incidents were not *objectively* offensive, severe, or pervasive, and thus would not deter a reasonable employee from making a charge of discrimination.

---

[3]     The court notes that Gordon's claim is retaliation, not hostile work environment, and thus the precise standard for "materially adverse" that governs Gordon's case is that discussed in *Burlington Northern*, as opposed to the "severe or pervasive" standard that is primarily discussed in caselaw involving standalone hostile work environment claims. Nevertheless, the court finds that analysis of the objectivity, severity, and pervasiveness of workplace harassment is directly relevant to *Burlington Northern*'s inquiry into whether an employer's action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68. Thus, in the analysis that follows, the court discusses several cases involving a hostile work environment, even if those cases did not involve a *retaliatory* hostile work environment.

Determining objective hostility is a "highly fact-specific inquiry." *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013). For that reason, the issue is often left for the jury. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018). But to survive summary judgment, Gordon still holds the burden as the non-moving party to respond and "identify[ ] specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). On the facts in the record, a reasonable jury cannot conclude that co-workers talking about wanting Gordon off the floor (incident 1); a co-worker calling Gordon lazy and a bad worker (incident 5); a co-worker talking about Gordon in a foreign language (incident 7); a co-worker using demeaning hand gestures when talking to Gordon (incidents 8 and 9); and mere speculation that supervisors were talking about ways to have Gordon fired (incident 11) combine to constitute a hostile work environment. These incidents, while potentially rude and insulting, are relatively benign compared to certain incidents the Seventh Circuit has previously found to fall short of the hostile work environment standard. For example, the court found it to be "a close call" and ultimately affirmed summary judgment for the employer where the co-worker-harasser's conduct included using racial epithets and other racially charged language, as well as slamming a food tray into the plaintiff's chest. *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 601 (7th Cir. 2014). Relatedly, the Supreme Court has explained that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Adding the remaining incidents Gordon documents to this analysis does not alter the court's conclusion. Crawford's verbal warning to Gordon for not making a patient's bed (incident 2); Gordon's being made to work the floor instead of "sitting" or finishing her EKG certification (incidents 3 and 4); Gordon's shift changing due to her low seniority (incident 6); and Gordon's cleaning a mess that occurred on a prior shift (incident 11) are, generally speaking, normal workplace occurrences. A verbal warning for alleged misconduct does not make Gordon's work

18

environment increasingly hostile; while courts can "give the concept of an adverse employment action [for purposes of a retaliation claim] a generous construction, it is not this broad." *Vance v. Ball State Univ.*, 646 F.3d 461, 475 (7th Cir. 2011) ("No reasonable jury could find that the delivery of a verbal warning, based on a complaint from a coworker, constitutes an adverse employment action or creates an objectively hostile work environment."). The incidents involving less-desirable tasks—which, Gordon does not dispute, are assignments clearly within her job duties—similarly do not change the court's analysis. *See Hobbs v. City of Chicago*, 573 F.3d 454, 463-64 (7th Cir. 2009) ("A materially adverse action must be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (quotation marks omitted). Regarding Gordon's shift, a change in assigned hours "certainly does not rise to the level of an adverse employment action." *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 728 (7th Cir. 2001). That is especially so given Gordon's acknowledgment that the shift change reflected "operational need[s]," and the Hospital tried to accommodate Gordon nevertheless. (Gordon Emails at 161; Def.'s SOF ¶¶ 29-30.)

As a last potential materially adverse action, the parties dispute whether Gordon's resignation might constitute a constructive discharge. (Def.'s Mem. in Supp. at 10-11; Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. (hereafter "Pl.'s Mem. in Opp'n") [69] at 8-11.) Gordon argues that there remains a genuine issue of material fact as to whether she was constructively discharged because "courts will apply a higher level of scrutiny when a plaintiff's supervisor, as opposed to a co-worker, is involved." (Pl.'s Mem. in Opp'n at 8.) As evidence, Gordon cites *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 638 n.6 (7th Cir. 2019), which notes that Seventh Circuit caselaw "distinguish[es] between supervisor and co-worker conduct as well as between direct and indirect harassment." The court in *Gates* found that the supervisor's use of racially toxic language was sufficiently severe conduct to deny the employer's motion for summary judgment. *Gates*, 916 F.3d at 638-39, 641. Gordon's case differs from these facts; much of the harassment she documents comes from co-workers, and her complaints about her

supervisors primarily have to do with the work tasks she was assigned and the discipline she was assessed. Moreover, the supervisor/co-worker distinction is not directly relevant here. To prove constructive discharge as a result of discriminatory harassment, Gordon must show her work environment was "even more egregious than the high standard for hostile work environment." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (citation omitted). As discussed, Gordon cannot show that she experienced a hostile work environment. Even if she could, she certainly cannot meet the higher bar for constructive discharge. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (discussing the difficulty for plaintiffs to show constructive discharge and noting that successful claims by plaintiffs often involve "a threat to a plaintiff's personal safety").

That leaves Gordon's suspension as the only materially adverse action taken by the Hospital for consideration here. As explained below, the court concludes that any claim arising out of her suspension (or any claim arising out of the incidents of harassment described above) would fail for an independent reason: Gordon cannot establish causation.

### 3. But-for causal connection

Gordon can use either direct or circumstantial evidence to establish a causal link between the protected activity—her 2017 Charge—and the Hospital's adverse action. Direct evidence, such as when an employer expressly admits that it is acting in a discriminatory manner, is rare. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Circumstantial evidence, in contrast, may include "suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 697 (7th Cir. 2017). It may also include "evidence that the employer offered a pretextual reason for an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (citations and internal quotation marks omitted). This list is not exclusive; the plaintiff can point to any "other

evidence from which an inference of discriminatory intent might be drawn." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016).

Critically, Gordon never clearly argues—beyond scattered conclusory statements—that the suspension (or other adverse action) was the Hospital's way of retaliating against her *for her 2017 Charge*. In fact, as Defendant notes, Gordon points to several *other* factors to explain the treatment she experienced. The primary factor Gordon discusses in her deposition and emails is the "clique" involving Supervisor Crawford and several co-workers that excluded Gordon from the outset of her employment because she associated with Brac Newman, a nurse whom others on the unit allegedly disliked. (Def.'s SOF ¶¶ 63-65.) The cause of the harassment that ensued, as Gordon states, was "favoritism": preferential treatment for those in the clique. (*Id.* at ¶ 22, 38-39, 61.) This causal explanation is strengthened by Gordon's admission that the harassment started years prior to her 2017 Charge; she states it began soon after starting at the Hospital, in 2015, when she first "grew a working relationship with Brac." (Def.'s SOF ¶ 67.) During her deposition, when Gordon was asked if there was "[a]nything else" beyond her association with Newman that could be the basis of alleged "retaliation," Gordon answered: "No." (Gordon Dep. at 28:22-33:4.)

Alternatively, Gordon also suspects that when she transferred to unit 5 East, her race played a role in the harassment she experienced. (Def.'s SOF ¶¶ 68-69.) Notably, Gordon's present claim before the court is that the Hospital retaliated against her for filing a charge of pregnancy discrimination, not that the Hospital engaged in race discrimination. But even if her claim concerned race, the ungrounded assumption that her Filipino-American co-workers "don't like Blacks" does not give rise to an inference that she suffered racial discrimination. (Def.'s SOF ¶ 69.) And Gordon has not indicated that either of her supervisors, themselves also Black, engaged in race discrimination. (Gordon Dep. at 8-11.)

Despite the likelihood of alternative causal explanations, Gordon still alleges that Defendant's actions followed the filing of her 2017 Charge "within such a time frame as to raise an inference of retaliatory motivation." (Pl.'s Third Am. Compl. ¶ 16.) This inference would need

to be very strong to overcome Gordon's own admission that her status outside Crawford's clique caused the rift. Moreover, suspicious timing alone "will rarely be sufficient . . . to create a triable issue." *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (citation omitted).

As a starting point, Gordon's suspension, coming two years after her 2017 Charge, does not give rise to an inference of retaliation based on timing. *See, e.g.*, *Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 710 (affirming summary judgment for the employer in part because a three-week gap between the plaintiff filing an EEOC complaint and being terminated from his employment was not sufficiently suspicious timing). As it pertains to her allegations of harassment, Gordon cites *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 829 (7th Cir. 2014), in which the court held that "no bright-line timing rule can be used to decide whether a retaliation claim is plausible or whether it should go to a jury." The court in *Carlson* was ruling on a motion to dismiss, not a motion for summary judgment; the plaintiff in that case merely needed to convince the court that the five-month gap between her protected activity and the defendant's alleged retaliation did not prevent the court from finding that her claim was plausible. *Carlson*, 758 F.3d at 828-29. The timeline in Gordon's case is similar: her June 2017 Charge occurred about five months before the first documented incident of harassment, in November. (Def.'s SOF ¶¶ 7, 9). Similar to *Carlson*, this court found Gordon's claim to be plausible notwithstanding that gap in time and rejected Defendant's motion to dismiss. (Order Den. Def.'s Mot. to Dismiss). At this stage, however, *Carlson* is not helpful to Gordon. In considering Defendant's motion for summary judgment, the court examines the evidence in the record, including the alternative causal explanations just discussed. *Carlson* found a multi-month gap in time was not dispositive in Defendant's favor, whereas Gordon now hopes that a similar gap in time might raise an inference of retaliation in *her* favor. Gordon is correct that a five-month gap does not, on its own, preclude a finding that Defendant retaliated against her, but the gap is also insufficient, on its own, to raise an inference of discrimination that overcomes other evidence in the record indicating her 2017 Charge was not the cause of any alleged adverse action.

22

In addition to the timing argument, Gordon hopes to raise an inference of retaliation by pointing to the Hospital's preferential treatment of comparably situated individuals. Gordon alleges Defendant "did not treat similarly situated non-African-American employees under like circumstances." (Pl.'s Third Am. Compl. ¶ 17.) And in her Response Memorandum, Gordon states that "other similarly situated, non-pregnant hospital employees were treated much differently than the plaintiff." (Pl.'s Mem. in Opp'n at 6.) To begin, neither of these statements indicate the most useful comparison for Gordon. Gordon's claim is that the Hospital retaliated against her for filing her 2017 Charge; an ideal comparator would be another employee at the Hospital who was similarly situated to Gordon in most respects but did not engage in protected activity, such as filing a charge, and therefore received better treatment. *See, e.g.*, *Crawford v. Ind. Harbor Belt R.R.*, 461 F.3d 844, 846 (7th Cir. 2006) (requiring the plaintiff to show "the members of the comparison group are sufficiently comparable to her to suggest that she was singled out for worse treatment"). Gordon cites or discusses eight email attachments to make her comparator case, but none of them are useful. (*See* Pl.'s Mem. in Opp'n at 6.) The emails allegedly document how co-workers received better treatment, but at no point does Gordon suggest the reason they were treated better had anything to do with their lack of engagement in activity protected by Title VII. To the contrary, the reason still seems to be that her co-workers were in a clique and Gordon was not; in one email, Gordon complains that co-workers and Supervisor Crawford "all cli[que] up and nothing get[s] done about it." (Pl.'s Additional Emails at 3.) For Gordon to rebut the explanation that the cause of her treatment was her exclusion from the clique, it would have been productive for her to show that a co-worker who was also excluded from the clique still received preferential treatment, or otherwise show that the clique's members were chosen on the basis of whether or not an employee engaged in protected activity. Gordon offers no such evidence.

Making matters more difficult for Gordon, it is not clear from the record that her supervisors were even aware of the 2017 Charge during the period Gordon alleges she was harassed and

23

suspended. In her Rule 56.1 Statement, Gordon claims she testified in her deposition that "Pamela Crawford was fully aware of the fact that [Gordon] had filed a charge of discrimination." (Pl.'s SOF ¶ 2.) In fact, however, a closer look at the transcript reveals that Gordon was unable to definitively say whether either supervisor—Crawford or Player—was aware. Regarding Crawford, Gordon claims she "[had] to know," because Gordon was told that the Hospital had interacted with "the managers" in "coming to a resolution" on her 2017 Charge. (Gordon Dep. at 111:21-112:7.) But, as Gordon also testified, there were multiple people above her with the title "manager," and thus it is not a sure thing that "the managers" included Crawford in this context. (*See* Gordon Dep. at 92:5-10 ("Q. At that point, who is the nurse manager on 5 East? A. Tiesa [Hughes-Dillard]. You got – they're all the same. Never changes. So when you go to 5 East, they transferred Pam [Crawford]. Now, she's back my manager again, and who's over her, Tiesa, and who is the other one, Kiana [Player].").) Regarding Player—the supervisor who issued the suspension—Gordon admits that she does not know whether or not Player knew about the Charge. ([66-1] at 112:11-15.) The absence of evidence showing that her supervisors were definitively aware of her 2017 Charge dooms her retaliation claim; "an employer cannot retaliate when it is unaware of any complaints." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000).

Even had Gordon provided sufficient evidence that the Hospital was engaging in retaliation due to her 2017 Charge, when it comes to Gordon's suspension—again, the only action this court finds to be materially adverse—the Hospital clearly stated a nondiscriminatory reason. The suspension notice lists two incidents where Gordon allegedly documented inaccurate urine output from Hospital patients. (Gordon Suspension at 171.) The Hospital explained its choice to suspend Gordon following these incidents, stating that the errors raise "serious safety concerns that potentially jeopardize[ ] patient wellbeing and place[ ] the University at risk for liability." (*Id.* at 172.) For Gordon to defeat summary judgment in this context, she bears the burden of producing "evidence that the defendant's proffered reason was pretextual." *Barnes v. Bd. of Trs.*

24

*of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020). Gordon does argue that documentation errors like hers are common, easily corrected, and never used as a reason for suspension. (Gordon Dep. at 100:18-101:3.) If Gordon had provided comparator evidence for this claim, such as evidence that other employees were not suspended for making similar errors, she may have been able to show that the Hospital's explanation was pretextual. But no such evidence is in the record.

Instead, Gordon emphasizes evidence in the record that she "performed her job more than satisfactorily." (Pl.'s Mem. in Opp'n at 5.) This evidence consists of various statements of recognition and praise from patients about Gordon's work as a nurse. (*See, e.g.*, Pl.'s Additional Emails at 40 ("Katreesha is genuinely sweet. She made a special effort to personally stop in and see my sister. . . . [S]he was able to help my sister['s] fears diminish and get her to smile. Katreesha is a rare individual that loves her job and it shows but more importantly it is obvious she cares for her patients.").) That Gordon was an effective care provider for her patients does not conflict with the Hospital's determination that Gordon made two critical mistakes measuring patients' urine. As such, they are not evidence that the Hospital's stated reasons for suspending Gordon were pretextual.

In sum, Gordon cannot establish a causal link between her 2017 Charge—protected activity under Title VII—and the Hospital's materially adverse action, suspending Gordon in 2019. In addition, though the court finds Gordon's allegations of harassment do not constitute a hostile work environment, and thus do not constitute a materially adverse action, Gordon similarly cannot show these incidents were retaliation for her 2017 Charge. As a result, Gordon cannot show that "a reasonable jury could return a verdict for the nonmoving party," and summary judgment for Defendant must therefore be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**<u>CONCLUSION</u>**

For the foregoing reasons, the court grants Defendants' motion for summary judgment [65].

ENTER:

Dated:  September 27, 2021

REBECCA R. PALLMEYER
United States District Judge